CENTAUR PARTNERS, IV, Plaintiff Below, Appellant,

v.

NATIONAL INTERGROUP, INC., a Delaware corporation, Howard M. Love, Charles J. Bradshaw, Sigo Falk, Buck Mickel, R.L. Ireland, III, Jean Mayer, Joseph L. Hudson, Jr., J. Clayburn Laforce, Douglas D. Danforth, Charles T. Fisher, III, James S. Pasman, Jr., and Richard S. Smith, Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: July 13, 1990.
Decided: July 13, 1990.
Written Opinion: November 15, 1990.

A. Gilchrist Sparks, III (argued), Lawrence A. Hamermesh and Robert J. Valihura, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, and Dennis J. Block, Nancy E.

Barton, Dushica B. Protic and Timothy E. Hoeffner, Weil, Gotshal & Manges, New York City, of counsel, for appellant.

R. Franklin Balotti, C. Stephen Bigler, Gregory Varallo and Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, and Norman Feit (argued), and D. Stuart Meiklejohn, Sullivan & Cromwell, New York City, of counsel, for appellees.

Before CHRISTIE, C.J., WALSH and HOLLAND, JJ.

WALSH, Justice:

This is an appeal by Centaur Partners, IV ("Centaur") from a decision of the Court of Chancery which determined that the classified Board of Directors of National Intergroup, Inc. ("National") could not be enlarged without an 80% supermajority stockholder vote. The Chancery litigation was a result of Centaur's efforts to increase the size of National's board of directors through the use of written consents to amend the by-laws in order to permit a majority of the board to be elected at the 1990 annual stockholders meeting.

We conclude that the Court of Chancery correctly determined that Article Eighth of National's charter was clear and unambiguous in requiring that an 80% supermajority would be needed to amend the by-laws of National, thereby overcoming the presumption of majority rule. Accordingly, we affirm the decision of the Court of Chancery.

## I

Centaur is an investment partnership created to purchase, acquire, and effect transactions with respect to the securities of corporations listed on the New York Stock Exchange. At the time this action was filed, Centaur and the other members of its group (the "Centaur Group")[1] owned 3,595,500 shares of National's common stock, which represented 16.53% of the shares outstanding. National is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. It is engaged in the wholesale distribution of pharmaceuticals, with significant operations and investments in the metals business.

On January 29, 1990, the Centaur Group filed a Schedule 13D with the Securities and Exchange Commission. In this filing, the Centaur Group stated that it believed the common stock of National to be undervalued and that stockholders could best realize value through the sale of all or a substantial part of the assets of National. The Centaur Group asserted that this could only be accomplished through the installation of a new slate of directors, to be elected at the 1990 annual stockholders meeting. This slate would be selected by Centaur and be committed to the sale of National or a substantial portion of its assets.[2] In an effort to attain their objective, the Centaur Group sought to amend National's by-laws to provide for the enlargement of the board of directors from 9 to 15 members.[3] This amendment would permit

1. Centaur Partners Group is composed of Centaur, owner of 16,000 shares; Estrin Abod Equities Limited Partnership, owner of 998,050 shares; Butler Equities II, L.P., owner of 1,789,750 shares; Melvyn E. Estrin, owner of 395,850 shares; Abbey J. Butler, owner of zero shares; and Charles B. Abod, owner of 395,850 shares.

2. Centaur retained two financial advisors, PaineWebber Incorporated and Jefferies & Company, Inc., to assist it in gaining control of the board of National, analyzing National and divesting certain of National's assets.

3. In its consent solicitation materials, Centaur presented a resolution to amend Section 16 of the by-laws to provide for the enlargement of the board of directors to 15. This provision stated:

The number of Directors of the Corporation shall be fixed at fifteen (15) commencing as of the election of directors at the 1990 Annual Meeting of Stockholders. The foregoing sentence is not subject to amendment, alteration or repeal by the Board of Directors. The total number of directors shall be divided as equally as possible among the three classes of Directors as specified in Section 13 above. If the office of any directors or director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, a majority of the remaining directors, though less than a quorum, shall choose a successor or successors, who shall hold office until the next election of the class or classes for which such director or directors shall have been chosen and until a successor or successors shall have been duly elected and

the Centaur Group to achieve the election of 8 directors at the 1990 annual meeting, thus giving the Centaur Group a majority of the directors on the board.

The Centaur Group stated in its 13D filing that in order to amend the by-laws, it required the written consent of a majority of the outstanding shares of common stock entitled to vote. The Centaur Group also claimed that it anticipates that National will argue that an 80% supermajority is needed to enlarge the board of directors. In order to resolve this dispute, Centaur brought a declaratory action in the Court of Chancery.[1]

The present controversy has its genesis in a previous modification of National's certificate of incorporation and by-laws. On May 17, 1984, National held its 1984 annual stockholders meeting. Prior to this meeting, management proxies were issued which contained amendments to both the certificate of incorporation and the by-laws. In its original form, Article Eighth of the certificate of incorporation provided that the number of directors shall be set in the

by-laws; the number of directors, however, could not be less than three.[5] At the 1984 annual meeting, the stockholders approved the amendment of Article Eighth.[6] The amended version of Article Eighth maintained its predecessor's requirement that the number of directors be fixed as provided in the by-laws and that the number not be less than three. The amended Article Eighth added two additional requirements. The first requirement was that of a classified board. The board was to be divided into three classes, with each class to serve a term of three years, and a new class to be elected each year. Second, the amended version of Article Eighth required that the affirmative vote of the holders of 80% or more of the voting power of the shares outstanding be required to amend this provision "or any similar provision" in the by-laws of the Corporation.

Section 16 of the original by-laws of National provided that the number of directors shall be fixed by the board of directors and that number shall not be less than three.[7] At the 1984 annual meeting,

---

qualified. Notwithstanding any other provision of these Bylaws, and, if authorized by the Certificate of Incorporation of the Corporation, the affirmative vote of the holders of 80% or more of the voting power of the shares of the then outstanding Voting Stock, voting together as a single class, shall be required to amend or repeal, or adopt any provision inconsistent with, this Section 16 or Section 13 of these Bylaws.

4. Centaur also sought injunctive relief against National's Shareholder Rights Plan. This count was later withdrawn pursuant to the parties' stipulation.

5. In its unamended form, Article Eighth provided:

The number of directors of the Corporation shall be fixed by and may from time to time be altered as provided in the by-laws, but shall not be less than three.

6. The amended version of Article Eighth states:

The number of directors of the Corporation shall be fixed by and may from time to time be altered as provided in the By-Laws, but shall not be less than three. The directors shall be divided into three classes with the total number of directors to be allocated among the three classes as equally as possible. The term of office of the first class shall expire at the annual meeting next ensuing; of the second class one year thereafter; of the

third class two years thereafter; and at each annual election held after such classification and election, directors shall be chosen for a full three year term to succeed those whose terms expire. The election of directors by classes as provided herein shall be irrespective of the directors which any separate class of shareholders may elect pursuant to the provisions of any resolution that may be adopted by the directors under Section 151 of the Delaware General Corporation Law and Article Fourth of this Corporation's Restated Certificate of Incorporation in regard to the authorization of one or more series of preferred stock. Notwithstanding any other provisions of this Restated Certificate of Incorporation or the by-laws of the Corporation, the affirmative vote of the holders of 80% or more of the voting power of the shares of the then outstanding voting stock, voting together as a single class, shall be required to amend or repeal, or adopt any provisions inconsistent with, this Article EIGHTH of this Restated Certificate of Incorporation or any similar provision contained in the By-laws of the Corporation.

7. Section 16 in its unamended form provided:

The number of directors of the Corporation shall be fixed from time to time by resolution of a majority of the entire Board of Directors, provided the number of directors of the Cor-

the stockholders voted to amend the by-laws. The amended version of Section 16 states that the board of directors shall set the number of directors and that it shall not be less than three.[8] The amended version of Section 16 also provides for the creation of a classified board and for the affirmative vote of 80% or more of the holders of the stock outstanding in order "to amend or repeal, or adopt any provision inconsistent with, this Section 16 or Section 13 [9] of these By–Laws."

Centaur's declaratory judgment action sought a determination that the consents of only 50.1% of the outstanding shares would be required to amend the by-laws. Upon cross motions for summary judgment, the Court of Chancery held that National's charter and by-laws unambiguously require the affirmative approval of 80% of National's outstanding shares to amend or repeal, or adopt any provision inconsistent with, the classified board provision or the provision authorizing the board of directors to set the size of the board. The court rejected Centaur's contention that the "or any similar provision" language of Article Eighth was ambiguous and in the face of such ambiguity majority vote must control. This appeal followed.

## II

■ The Court of Chancery ruled as a matter of law, upon cross motions for summary judgment, that National's charter and by-laws required a supermajority vote to change the composition of its board of directors. The construction or interpretation of a corporate certificate or by-law is a question of law subject to *de novo* review by this Court. *Gilbert v. El Paso*, Del. Supr., 575 A.2d 1131, 1141–42 (1990); *Cavalier Oil Corp. v. Harnett*, Del.Supr., 564 A.2d 1137, 1141 (1989).

■ The Delaware General Corporation Law does not specify the percentage of votes necessary for the election of directors. *See* 8 *Del.C.* § 216. In the event the certificate of incorporation or by-laws fail to fix a percentage, a plurality of the votes present or represented by proxy at the stockholders meeting is required. 8 *Del.C.* § 216(3). Therefore, in the absence of a charter or by-law provision to the contrary, the rule in corporate elections is that the affirmative vote of a plurality of the shareholders is sufficient to elect directors.

■ In order to abrogate the rule of plurality control, charter and by-law provi-

poration shall not be fixed at less than three (3). If the office of any director or directors becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, a majority of the remaining directors, though less than a quorum, shall choose a successor or successors who shall hold office until the next annual meeting of the stockholders and until a successor or successors shall have been duly elected and qualified.

**8.** The amended Section 16 states:

The number of directors of the Corporation shall be fixed from time to time by resolution of a majority of the entire Board of Directors, provided that the number of directors of the Corporation shall not be fixed at less than (3), and, further provided that the total number of directors shall be divided as equally as possible among the three classes of Directors as specified in Section 13 above. If the office of any director or directors becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, a majority of the remaining directors, though less than a quorum, shall choose a

successor or successors who shall hold office until the next election of the class or classes for which such director or directors shall have been chosen and until a successor or successors shall have been duly elected and qualified. Notwithstanding any other provision of these By–Laws, and, if authorized by the Certificate of Incorporation of the Corporation, the affirmative vote of the holders of 80% or more of the voting power of the shares of the then outstanding Voting Stock, voting together as a single class, shall be required to amend or repeal, or adopt any provision inconsistent with, this Section 16 or Section 13 of these By–Laws.

**9.** Section 13 provides:

The term of the first class shall expire at the annual meeting next ensuing; of the second class one year thereafter; of the third class two years thereafter; and at each annual meeting election held after such classification and election, directors shall be chosen for a full three-year term to succeed those whose terms expire and to serve in such capacity until his or her successor has been duly elected and qualified.

sions purporting to have that effect must be clear and unambiguous. *Standard Power & Light Corp. v. Investment Associates, Inc.*, Del.Supr., 51 A.2d 572, 576 (1947). Such provisions do not achieve ambiguity simply because the parties disagree concerning their meaning. It is only if the disputed language, read in proper context, is reasonably susceptible of different interpretations that ambiguity may be found to exist. *Hibbert v. Hollywood Park, Inc.*, Del.Supr., 457 A.2d 339, 343 (1983).

■ In *Standard Power*, this Court held that the rules of corporate democracy are based in large part upon the principle that a majority of the votes cast at a stockholders meeting is sufficient to elect directors. 51 A.2d at 576. Although by statute a simple plurality provision now suffices, the result is the same: a charter or bylaw provision which purports to alter this principle must be "positive, explicit, clear and readily understandable...." *Id.* This presumption is overcome only by a clear, unambiguous and unequivocal statement, in the charter or by-laws of a corporation, expressing the stockholders' desire that a specific percentage of votes be required.

The Delaware General Corporation Law affords considerable flexibility in the construction of mechanisms for corporate governance and control. One example of such a device is the supermajority vote provision. *Cf. Berlin v. Emerald Partners*, Del.Supr., 552 A.2d 482, 489 n. 8 (1988) ("Supermajority vote provisions were originally formulated as antitakeover devices. By requiring a greater percentage of stockholders to approve a proposed action, stockholders are given more power to defeat actions adverse to their interests."). Thus, a high vote requirement may protect a minority shareholder against squeeze-out techniques employed by insurgents able to command a bare majority of votes. F. O'Neal & R. Thompson, *O'Neal's Oppression of Minority Shareholders* § 9:08, at 19 (2d ed. 1985). However, supermajority provisions give minority shareholders the power to veto the will of the majority, effectively disenfranchising the majority. *See* Bebchuck, *Limiting Contractual*

*Freedom in Corporate Law: The Desirable Constraints on Charter Amendments*, 102 Harv.L.Rev. 1820, 1856 (1989).

■ There exists in Delaware "a general policy against disenfranchisement." *Blasius Indus. v. Atlas Corp.*, Del.Ch., 564 A.2d 651, 669 (1988). This policy is based upon the belief that "[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests." *Id.* at 659; *see Concord Financial v. Tri-State Motor Transit Co.*, Del.Ch., 567 A.2d 1, 5 (1989). Therefore, high vote requirements which purport to protect minority shareholders by disenfranchising the majority, must be clear and unambiguous. There must be no doubt that the shareholders intended that a supermajority would be required. When a provision which seeks to require the approval of a supermajority is unclear or ambiguous, the fundamental principle of majority rule will be held to apply.

■ In the present case, the charter and by-law provisions are not unclear or ambiguous. Article Eighth of National's charter provides that an 80% supermajority vote shall be required to amend or repeal that portion of the charter which requires three equal classes of directors, with one third to be elected annually, "or any similar provision contained in the By-Laws of the corporation." Section 16 of the by-laws states that the board of directors shall fix the number of directors and that it shall not be less than three. Section 16 also provides that an 80% vote shall be required to adopt a provision inconsistent with Section 16 or Section 13.

These provisions are clearly similar. They are similar because they address the same subject and impose the same requirement. The subject addressed by these provisions is amendments to the charter or by-laws which affect the size and election of the board of directors. The requirement imposed by these provisions is an 80% supermajority to amend the by-laws in order to enlarge the board of directors. Thus, the affirmative vote of 80% of the stockholders is required to amend the by-laws

and enlarge the board of directors of National.

## III

Centaur argues that the articles of incorporation do not explicitly require an 80% supermajority vote for the repeal of the entirety of Section 16. Centaur claims that the requirement only applies to those provisions which are similar and that the only similar provisions are the provisions which state that the directors shall be divided as equally as possible among the three classes. Thus, it is argued, the 80% requirement should not apply because Centaur does not wish to amend this provision. We disagree.

■ Corporate charters and by-laws are contracts among the shareholders of a corporation and the general rules of contract interpretation are held to apply. *See Berlin v. Emerald Partners,* 552 A.2d at 488; *Hibbert v. Hollywood Park, Inc.,* 457 A.2d at 342–43; *Ellingwood v. Wolf's Head Oil Refining Co., Inc.,* Del.Supr., 38 A.2d 743, 747 (1944). In the interpretation of charter and by-law provisions, "[c]ourts must give effect to the intent of the parties as revealed by the language of the certificate and the circumstances surrounding its creation and adoption." *Waggoner v. Laster,* Del.Supr., 581 A.2d 1127, 1134 (1990). Therefore, the intent of the stockholders in enacting particular charter or by-law amendments is instructive in determining whether any ambiguity exists.

■ In the present case, the context in which the amendments to the certificate of incorporation and accompanying by-laws were approved by the shareholders indicate that they were adopted in tandem and intended to be complementary. The relevant amendments to the certificate of incorporation and the accompanying by-law provision were adopted at the 1984 annual stockholders meeting. The changes were contained in the proxy materials which were distributed to the stockholders prior to the 1984 annual meeting. In a section entitled "Election of Directors by Class," the proxy materials state:

[t]he Board of Directors has unanimously adopted resolutions recommending that the stockholders amend the Corporation's Certificate of Incorporation and the Corporation's By–Laws to provide for the division of the Corporation's directors into three classes, the directors in each class to serve for a term of three years.... The proposed amendments also contain a provision, which, if adopted, shall provide that the affirmative vote of the holders of 80% or more of the outstanding stock of the Corporation be required to amend or repeal these new provisions in the Certificate of Incorporation and the By–Laws.

This explanation illustrates the intended result of the proposed combined change in the charter and by-laws that the board be classified and that a supermajority vote of 80% or more be required to amend any portion of these two provisions.

The classification of the board and the 80% supermajority vote are designed to insure continuity in the board of directors and avoid hostile attempts to takeover the corporation. As the proxy materials recite:

[a] further purpose of the proposed change is to discourage unfriendly takeovers of the Corporation. The attempts to seize control of public companies through the accumulation of substantial stock positions followed by a tender offer and squeeze out merger are well known today. These transactions are often followed by a substantial restructuring of the company, a significant disposition of assets or other extraordinary corporate action.

Given the clear language of the proxy materials, the conclusion is inescapable that the stockholders, in adopting these two provisions, evidenced an intent to classify the board and impose an 80% supermajority requirement on amendments to these sections in order to thwart attempts to seize control of National.

The Vice Chancellor determined that both the charter and by-law provisions deal with the number of directors, the classified nature of the board and the vote required to amend these provisions. We agree and

find that Centaur's reading of Section 16 completely abrogates the intention of the stockholders who adopted these provisions at the 1984 annual meeting. Article Eighth clearly and unequivocally establishes a classified board with no more than a third of the board subject to replacement (other than death or resignation) in any one year. Moreover, both the charter provisions and the by-law provisions confer solely on the directors the power to fix the number of directors on the board "from time to time." Centaur's argument for a 50% threshold is contrary to the clear purpose reflected in the language of the amended certificate of incorporation. The proxy materials issued prior to the 1984 annual meeting indicate the intent of the stockholders in adopting the amendments was to impose an 80% supermajority requirement on attempts to amend these provisions.

## IV

Finally, in the event Centaur's by-law amendment were to be adopted it would be void. The Delaware General Corporation Law provides: "[t]he bylaws may contain any provision, not *inconsistent with* law or with the certificate of incorporation...." 8 *Del.C.* § 109(b) (emphasis added). Where a by-law provision is in conflict with a provision of the charter, the by-law provision is a "nullity." *Burr v. Burr Corp.*, Del.Ch., 291 A.2d 409, 410 (1972); *see Prickett v. American Steel and Pump Corp.*, Del.Ch., 253 A.2d 86, 88 (1969).

Centaur's proposed amendment to Section 16 of the by-laws states: "[t]he number of Directors of the Corporation shall be fixed at fifteen (15) commencing as of the election of directors at the 1990 Annual Meeting of Stockholders. The foregoing sentence is not subject to amendment, alteration or repeal by the Board of Directors." Article Eighth of the articles of incorporation provides: "[t]he number of directors of the Corporation shall be fixed by and may from time to time be altered as provided in the By-Laws...." To the extent that the directors have general authority to adopt or amend corporate by-laws,

these two provisions are in obvious conflict. The by-law amendment proposed by Centaur fixes the number of directors at fifteen. Article Eighth grants the board broad authority to fix the number of directors, which power may be exercised from time to time through the adoption of by-laws. Because the proposed provision is clearly "inconsistent with" the directors' power to enlarge the board without limit, it would be a nullity if adopted.

\* \* \*

AFFIRMED.